**EXHIBIT A**

1  Michael Cohen - #98066
   Attorney at Law
2  345 Grove Street
   San Francisco, CA 94102
3  415/861-4414
   Fax: 415/431-4526
4
   Attorney for Plaintiff
5
6
7

**F I L E D**
Superior Court of California
County of San Francisco

MAY - 8 2017

CLERK OF THE COURT
BY: _____
        Deputy Clerk
NOWMAN LIU

8        SUPERIOR COURT OF CALIFORNIA, CITY AND COUNTY OF SAN FRANCISCO

9    Victoria Card,                    No.

10            Plaintiff,        **COMPLAINT**        CGC - 17 - 558725

11   vs.

12   Ralph Lauren Corporation,
     Ralph Lauren Company
13   West, LLC, E. J. Victor,
     Inc., and DOES 1-100,
14
             Defendants.
15   _____/

16                              **PARTIES**

17        1.     PLAINTIFF is a competent adult, who was doing business, largely selling the

18   products of the Lauren Defendants as Pacific Heights Place (hereinafter PHP), in the City and

19   County of San Francisco, from 2006 to 2015, and, before that, from 2001 to 2005, through her

20   previous business, Bluestone Main, which business PLAINTIFF had sold at a handsome profit.

21        2.     Defendant RALPH LAUREN CORPORATION is a corporation qualified to do,

22   and doing, regular business in California, conducting such business, as a parent corporation,

23   through numerous subsidiaries and/or departments, as well as through various manufacturer

24   and/or dealer partners, its subsidiary most relevant hereto being Ralph Lauren Home which

25   featured the particular products, products, i.e., furniture, lighting, fabric, and accessories, that, for

26   the most part, constituted PLAINTIFF's business

                                        1

                                   Complaint

3.     Defendant RALPH LAUREN COMPANY WEST, LLC is a corporation doing regular business in California, and one of the subsidiaries of its parent, Defendant RALPH LAUREN CORPORATION.

4.     Defendant E. J. VICTOR, INC., is a corporation doing regular business in California, who took over the manufacturing of the Lauren Defendants' products, as said Defendants' partner, from approximately 2008, and who acted as the Lauren Defendants' agent in selling those products to PLAINTIFF, and in otherwise monitoring the terms of the Lauren Defendants' relationship with PLAINTIFF.

5.     PLAINTIFF does not know the true names and capacities of Defendants sued herein as DOES 1 through 100, inclusive, and therefore sues these Defendants by such fictitious names. PLAINTIFF will amend the complaint to show the true name and capacity of each such Defendant when each such identity has been ascertained. PLAINTIFF is informed, believes and thereon alleges that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged, and that PLAINTIFF's damages as herein alleged were legally caused by their, and/or each of their, conduct.

6.     PLAINTIFF is informed, believes, and thereon alleges, that each of the Defendants, DOE and named, was at all times relevant the agent, employee, representative and/or co-conspirator, of each of the other Defendants, and was acting within the course and scope of such employment, representation and/or conspiracy at the time each Defendant engaged in the conduct complained of herein; and PLAINTIFF is informed, believes, and thereon alleges, that, in conformity with such employment, representation and/or conspiracy, each of the Defendants encouraged, participated in, and/or ratified and approved the conduct complained of herein.

## COMMON ALLEGATIONS

7.     PLAINTIFF was an approved dealer of Ralph Lauren home from 2001 to May 8, 2015, when the Lauren Defendants, without warning or cause, and in violation of PLAINTIFF's legal rights as well as of any conceivably reasonable business justification, precipitously

2

1  terminated PLAINTIFF's account (which had continuously provided the herein named

2  Defendants with substantial business, superior to others), thus, essentially, killing PLAINTIFF's

3  business, which she had built up over 14 years, thereby causing her great economic and non-

4  economic damages.

5          8.      Passionately believing in the quality, beauty and superiority of the Ralph Lauren

6  brand in those areas, PLAINTIFF, during those years, built a large clientele for in those products,

7  by means of extraordinary personal attention to the needs and desires of customers who desired

8  to clothe their homes, to varying degrees often exclusively, in those Ralph Lauren products, often

9  personally advising the customer, again, not only as to individual purchases and placement, but

10  also in connection with the development in the furnishing and decorative plan of a new, newly

11  acquired, and/or remodeled home, from the beginning to the end of such projects, some of which

12  took years to complete.

13          9.      In doing so, PLAINTIFF developed, through her San Francisco location and its

14  international cache', a large clientele, located all over the world, of both repeat and referred

15  business; and became a top producer of Ralph Lauren home products during those years, 2001 to

16  2015, through all the ups and downs of the economy in general and the furniture business in

17  particular (especially the extraordinarily harsh economic downturn of 2008-2011, during which

18  time many of PLAINTIFF's competitors, including established large institutions and splashy

19  start-up online discounters, either failed or simply stopped selling such merchandise), purchasing

20  the following amounts of the herein Lauren Defendants' products, with the following amounts of

21  Profit by selling those products, year by year, as follows:

22                      a.     2002:  $100,000 Wholesale,  $135,000 Profit

23                      b.     2003:  $235,000 Wholesale,  $317,250 Profit

24                      c.     2004:  $350,000 Wholesale,  $427,500 Profit

25                      d.     2005:  $500,000 Wholesale,  $675,000 Profit

26                      e.     2006:  Between businesses

3

1       f.    2007:  $280,745 Wholesale,  $379,005 Profit

2       g.   2008:  $255,635 Wholesale,  $345,107 Profit

3       h.   2009:  $97,783 Wholesale,   $132,007 Profit

4       i.    2010:  $99,607 Wholesale,   $134,469 Profit

5       j.    2011:  $154,282 Wholesale,  $69,936 Profit

6       k.   2012:  $154,282 Wholesale,  $208,220 Profit

7       l.    2013:  $268,512 Wholesale,  $362,491 Profit

8       m.   2014:  $254,809 Wholesale,  $209,500 Profit

9       n.   2015 (truncated):   $102,430 Wholesale,  $205,000 Profit

10      10.    During this entire time, PLAINTIFF never incurred any business indebtedness or

11  delinquencies, operating at all times on a Pay as You Go basis, and meeting any and all

12  requirements set forth by the Lauren Defendants for stocking, inventory, display, quality, etc.

13      11.    The structure of the business relationship between PLAINTIFF and the Lauren

14  Defendants was one, as expressly stated by the Lauren Defendants, of Partnership (in which

15  Defendant VICTOR was also expressly a Partner), which, because of the fiduciary relations

16  attendant thereto, as well as the contractual requirements of good faith and fair dealing, gave

17  PLAINTIFF the legal right to continue in this business relationship, barring actual mis-conduct

18  by PLAINTIFF violative of the rights of the Lauren Defendants and/or of the terms of their

19  relationship (which such mis-conduct by PLAINTIFF never occurred), and to be treated in good

20  faith and fairly dealt with during the course of the relationship - these rights being further

21  confirmed by the extraordinary length of the relationship and PLAINTIFF's universally good

22  faith conduct throughout.

23      12.    In 2009, an online company (One Kings Lane, hereinafter OKL), with the

24  assistance (PLAINTIFF is informed and believes) of approximately $230,000,000 in venture

25  capital, started a business of selling the Lauren Defendants' products at extraordinary discounts,

26  characteristically as much as 75-80% off suggested retail - discounts orders of magnitude bigger

1  than any discounts at which PLAINTIFF was allowed, by the terms of her relationship with the

2  Lauren Defendants, to sell, thus creating a major threat to PLAINTIFF's business.

3        13.    In 2010, in light of that patently unfair situation, PLAINTIFF requested from

4  Defendant VICTOR, who was acting as the Lauren Defendants' agent in selling the Lauren

5  Defendants' products to PLAINTIFF, based on the Lauren Defendants' approval, the right to sell

6  at at least somewhat larger discounts than PLAINTIFF had theretofore been allowed; and

7  PLAINTIFF was allowed that for a few items.

8        14.    In February of 2011, as OKL's discounts reached the aforementioned

9  astronomical levels, PLAINTIFF complained to Defendant VICTOR, about the unfairness of the

10  situation.

11        15.    In March 2011, Defendants, and each of them, began to retaliate against

12  PLAINTIFF, by threatening to bar her use of all references to the Lauren Defendants' products in

13  (a) PLAINTIFF's PHP website, and (b) the front of PLAINTIFF's physical establishment -

14  although they did not follow-through on those threats at that time.

15        16.    By late 2011/Early 2012, OKL's discounts reached 80-85%, and big retail

16  institutions such as Bloomingdale's and ABC Home and Carpet were regularly offering big

17  discounts, all bigger than anything PLAINTIFF was allowed; and PLAINTIFF continued to try to

18  rectify that situation in communications with Defendants.

19        17.    In March 2012, the President of Defendant VICTOR, in a phone call with

20  PLAINTIFF, again threatened to order PLAINTIFF, this time to take her whole website down, as

21  well as Lauren signage from the front of her physical establishment.

22        18.    PLAINTIFF thereafter continued to seek to remedy the situation by being allowed

23  to discount discontinued items that OKL was selling to the public at lower prices than VICTOR

24  was charging PLAINTIFF, or by discounting Defendant VICTOR's excess inventory, items

25  subject to specific promotions, and/or prototypes and/or samples; and Defendant VICTOR agreed

26  as to certain discontinued and/or reduced times, and to allow PLAINTIFF to buy at the same

1    price charged to OKL.

2         19.    However, in May 2012, PLAINTIFF was informed that some discontinued items

3    were reinstated, and that, contrary to past practice (at least as applied to PLAINTIFF),

4    promotions were limited in time, and the price of those items reverted when the promotions

5    ended; and PLAINTIFF began to wonder what was going on, given that the prior practice was to

6    put Lauren items on sale only when they were being retired.

7         20.    Further, in trying to explain this to PLAINTIFF, Defendant VICTOR's

8    representative stated that designers (many of whom bought from PLAINTIFF) were now being

9    allowed to buy direct from Defendant VICTOR, although, in trying to explain further, said

10   representative stated that the category of buyer to which she was referring was really "non-

11   stocking dealers", albeit at a higher price than charged to "stocking dealers"; and, although,

12   according to the representative, PLAINTIFF was a "non-stocking dealer", Defendant VICTOR

13   nevertheless charged PLAINTIFF the lower rate.

14        21.    However, the truth is that PLAINTIFF had always been a "stocking dealer",

15   buying hundreds of thousands of dollars of the Lauren Defendants' product annually, and

16   PLAINTIFF had never previously heard that "non-stocking dealers" were ever allowed to buy

17   this product at all.

18        22.    Indeed:

19               a.    This explained the phenomena about which PLAINTIFF was learning of

20   persons coming into her store, acquiring all the information about the products therein and then

21   buying directly from the manufacturer; and

22               b.    This resulted in the anomalous business effect of Defendant VICTOR

23   putting Defendant Lauren's products in boutique sections of certain retail stores, on credit (unlike

24   PLAINTIFF who was required to buy the products outright), such that, when those stores

25   declared bankruptcy, Defendant VICTOR lost hundreds of thousands of dollars (whereas, of

26   course, none of the Defendants ever lost a cent dealing with PLAINTIFF.

1    23.    Again nevertheless, PLAINTIFF continued to try to negotiate further discounts

2    from Defendants; but continued getting put off.

3    24.    However, in April 2013, the Lauren Defendants, for reasons unknown to

4    PLAINTIFF, indicated to PLAINTIFF the instituting of Draconian conditions against

5    PLAINTIFF, as follows:

6         a.    Prohibiting PLAINTIFF from:

7              (1)    Selling Lauren products outside of authorized distribution

8    channels, or

9              (2)    Using any unauthorized Lauren images [keeping in mind also that

10   PLAINTIFF never requested to sell outside of authorized distribution channels, or take any

11   images illegally from any Lauren website - all Lauren images in PLAINTIFF's possession having

12   been previously given to her by the Lauren Defendants], or

13             (3)    Violating promotional guidelines by promoting 50-60% discounts

14   [which PLAINTIFF had never done], or

15             (4)    Misrepresenting the availability of Lauren products [which

16   PLAINTIFF had also never done]; and

17        b.    So, PLAINTIFF was going to be ordered:

18             (1)    to remove all Lauren images and references from the PHP website,

19   and

20             (2)    Discontinue selling Lauren products online.

21   25.    In response, PLAINTIFF, seeking to save her business, sent a long letter to the

22   Lauren Defendants, setting forth the following facts:

23        a.    When PLAINTIFF first approved (in 2001), she was given catalog images

24   to choose the items for her showroom - from which she constructed her showroom;

25        b.    Those images & their lifestyle constitute the reason tha Lauren product

26   sells;

7

Complaint

1         c.      PLAINTIFF was always a premier Lauren dealer - upholding the standards

2 of the products, which she personally loves;

3         d.      Having invested hundreds of thousands of dollars of her own money into

4 into showroom samples and products, and having sold millions of dollars worth of Lauren

5 products, she is nothing else but loyal;

6         e.      PLAINTIFF had always been given catalogs, CD images, postcards, and

7 fabric samples;

8         f.      PLAINTIFF is extraordinarily attentive to showcasing these products;

9         g.      PLAINTIFF, with extraordinary (indeed) valor, managed to rally and

10 maintain her business and high standards against both (a) the Great Recession, and (b) unfair

11 competition from:

12           (1)     Auctions conducted by Defendants themselves;

13           (2)     Online discounted sales by the Lauren Defendants on their own

14 website;

15           (3)     The massive discounts from OKL who:

16               (a)     Received cut-throat prices,

17               (b)     Did not have to maintain major costs, and

18               (c)     In any case, could afford to keep losing money, because the

19 founders were multi-millionaires;

20           (4)     Defendant Victor's own undercutting through advertized selling

21 "below dealer pricing"; and

22           (5)     The existence of an extraordinary number of Lauren images online,

23 on the websites of other numerous other (specified) retailers, most 80% discounted (which fact,

24 alone, just further highlights the absurdity of Defendants' charge of PLAINTIFF's supposed

25 unauthorized use of images which, again, were (a) given to PLAINTIFF by Defendants, and (b)

26 substantial aids in marketing Defendants' products.

1      26.      The response to PLAINTIFF's long letter was five months of absolute silence.

2      27.      In October 2013, the President and other Executives of Defendant VICTOR

3 phoned PLAINTIFF:

4             a.      Thanking her for her orders and for being a great account;

5             b.      Nevertheless told her she should remove all Lauren items from her

6 website until she was in compliance with Lauren guidelines  - a mystifying statement to

7 PLAINTIFF who was always promptly responsive to anything she was told by Defendants, and

8 who had never been provided with any relevant guidelines - and certainly no rules with which

9 she had not complied;

10            c.      And she was told of the Lauren Defendants' new policy on internet sales,

11 which she had not seen

12            d.      PLAINTIFF was also told that she is a furniture store, like Bloomingdales,

13 Macy's, Horchow, Neiman Marcus & other retailers who have agreements with Lauren, so they

14 can run internet ads.

15      28.      In response, PLAINTIFF (among other things):

16            a.      Reminded Defendants of her excellent track record with them, while

17 reciting the true history of this conflict (described hereinabove);

18            b.      Requested that, in future, for such communications, she be provided the

19 opportunity to consult an attorney in advance

20            c.      Mentioned that, in this phone call, these VICTOR people refused to

21 disclose who had complained about her within the Lauren Defendants [but they did peripherally

22 mention William Li (who had recently been appointed President of "Ralph Lauren Home" (i.e.,

23 Lauren's furniture, etc., division), and Daniel Strassburger, of whom PLAINTIFF had theretofore

24 had no knowledge, and with whom she had had no communications; and

25            d.      Emphasized that, in her small business, interruption would cause

26 catastrophic damage.

29.     In late November, Mr. Li phoned PLAINTIFF, totally out of the blue, and never having communicated with PLAINTIFF, apparently solely to threaten PLAINTIFF without wanting to receive any communication from PLAINTIFF in response, or otherwise.

30.     A week later, a lighting manufacturer, Andy Singer, wrote PLAINTIFF to set up a phone conference with PLAINTIFF, Mr. Singer, and Mr. Li.

31.     PLAINTIFF:

        a.      Responded that she would feel uncomfortable without counsel participating, and with Mr. Li not face-to-face;

        b.      Mentioned her confusion about why, when, at the end of Mr. Li's threatening phone call, he'd stated he would email Plaintiff with a phone number and time for further communication, he had delegated this to Mr. Singer;

        c.      Requested that Mr. Li put into writing what he wanted to communicate, pointing out that:

                (1)     Mr. Li refused to provide specifics, and said he didn't want to go through the legal department; and

                (2)     Writing would avoid the confusion represented by his incorrectly stating that PLAINTIFF had not responded to the legal department, when exactly the reverse was the case.

32.     The following day, through several new underlings, Mr. Li, without notice, purported to close PLAINTIFF's Accessory Account; and PLAINTIFF thereafter wrote to the new Lauren President, Mr. Sears, as well as Ralph Lauren's son, David, describing Mr. Li's unannounced and abusive phone call, at a time when she could not substantively participate because of her being tied up in a meeting, refusal to put anything in writing, and his failure to live up to his promise to get back to her with a phone number for her to call him, and a subsequent time in which he would be available.

33.     Mr. Sears responded with a number of false statements:

10

Complaint

1      a.     The implication that a Lauren right to discontinue PLAINTIFF's account

2 may stem from a failure on PLAINTIFF's part to uphold the high standards of quality and

3 prestige associated with Lauren products (when there is nothing in PLAINTIFF's history to

4 justify anything like such an implication); and

5      b.    That the legal team had sent PLAINTIFF a second letter (which, if they

6 did, PLAINTIFF has to this day never seen) which repeated the FALSE charges of:

7      (1)    PLAINTIFF's website being unauthorized (when Lauren had never

8 requested that it be authorizd),

9      (2)    PLAINTIFF used images Lauren product AND tradmarks without

10 authorization (when the images had been given to PLAINTIFF by Lauren, encouraging

11 PLAINTIFF'S use),

12      (3)    Violation of Lauren corporate promotional guidelines (that

13 PLAINTIFF had never seen, other than to conform with various Lauren directives as she received

14 them); and

15      (4)    Misrepresenting the availability of various Lauren products

16 (regarding which charge PLAINTIFF has never had any idea what it refers to, and no explanation

17 of it has ever been provided).

18     34.    On 11/20/13, the Lauren Defendants instituted an account approval process.

19     35.    This process involved, among other things, site visits by executives of Defendant

20 VICTOR, whose President stated that he was there to "save" PLAINTIFF's account, but would

21 not tell PLAINTIFF either who targeted her account or why it was being targeted.

22     36.    In connection with this process, the Lauren Defendants "re-opened" PLAINTIFF's

23 account, officially "deferring its discontinuation" pending completion of the re-application

24 process, which was to be divided into two parts, a "bricks & mortar" component, and a

25 subsequent application for online sales; and the Lauren Defendants stated that the process would

26 be facilitated by Mr. Li.

37.     During this period, in contrast with PLAINTIFF (whose business was successfully climbing out of the depths of the recession), VICTOR's President informed PLAINTIFF that none of the other Northern California accounts (e.g., Sunrise Home in San Rafael, St. Dizier in Healdsburg, and Trident in Yountville - none of whom were being put through anything like the gauntlet which PLAINTIFF was facing) were selling anything; and, coincidentally, OKL was beginning to show signs of its eventual failure.

38.     As part of the Application process, VICTOR demanded various things (e.g., numerous particularized photographs, the inclusion of other brands, and evidence of the store's particular location) from PLAINTIFF, which PLAINTIFF duly provided; and, in January 2014, VICTOR informed PLAINTIFF that the Lauren Defendants had been approved to sell their VICTOR-manufactured products, with certain rules pertaining to display, current inventory, staffing and hours of operation; and other rules that would apply to PLAINTIFF's e-commerce, which would be the next step in the application process - with which at least some of which rules it appears that other Northern California accounts could not conceivably comply.

39.     In February 2014, it came to PLAINTIFF's attention that the Lauren Defendants were putting PLAINTIFF at another type of competitive disadvantage by increasing discounts to other companies, such as OKL and Bloomingdales through the mechanism of lowering the suggested retail price and discounting that.  PLAINTIFF inquired about that, but received no response.

40.     In June 2014, the Lauren Defendants instituted the e-commerce qualification process, with online brand guidelines and technical and style imagery rules; and, in a 6/19/14 phone conference with several Lauren executives (including Lauren Kwiatkowski, Ro Turner and Daniel Strassburger), PLAINTIFF was told that, as a partner, the Lauren Defendants would participate in putting all of Ralph Lauren Home's products on PLAINTIFF's website, as part of a huge endeavor to rebuild the website entirely.

41.     In follow-up communications, Ms. Kwiatkowski praised the process and

1  recognized PLAINTIFF's commitment to, and enthusiasm for, the project, calling it a great kick-

2  off to the partnership; and, in a 7/16/14 email, she enclosed the current season's Market Book,

3  the second section of which outlined available marketing tools and assets (includng postcards/

4  invitations/email Blasts/In-Showroom videos, and regioinal advertising) -- discussing that tactics

5  would be created by the Lauren Defendants with PLAINTIFF's full input and approval, and

6  further discussing technical issues in dealing with the digital construction.

7       42.     In August 2014, two largely unrelated events occurred, nevertheless relevant, in

8  different ways, to PLAINTIFF:

9              a.     OKL closed a major office; and

10             b.     William Li became President of Ralph Lauren Home.

11      43.     In November 2014, PLAINTIFF published her new, revised website, to great

12  praise by the Lauren Defendant partners of PLAINTIFF's in this endeavor, although there is

13  reason to believe that the Lauren Defendants had put PLAINTIFF through this process in the

14  anticipation that PLAINTIFF would not be able to afford the hundreds of thousands of dollars the

15  process was generally projected to cost.  However, through extraordinary creative effort and

16  work by those involved in the process on PLAINTIFF's behalf, the revision was accomplished,

17  with flying colors, at a fraction of the projected cost.

18      44.     In this connection, an extraordinarily significant part of e-commerce is a Google

19  service called "AdWords" which both (a) links its search engine to particular websites relevant to

20  particular search words, and (b) monitors the relevant traffic to such websites, the major

21  significance of which, especially as e-commerce becomes more and more central to the entire

22  capitalist venture, is that the amount of such traffic holds a direct relevance to the amount of

23  commerce that website's business is able, in fact, to conduct, i.e., directly to the size and success

24  of that website's business; and relevantly herein, because the Lauren Defendants had required the

25  website to change from being based on Yahoo to being instead based on an Application called

26  Wix, PLAINTIFF's website's link to AdWords got dropped; and the AdWords people informed

1   PLAINTIFF that re-instating that link would require the Lauren Defendants' approval, which

2   PLAINTIFF immediately requested, with every indication that such approval would be

3   forthcoming shortly.

4        45.    However, by the end of the year, not even any response to this request had

5   occurred; and, in January 2015, PLAINTIFF solicited the help of AdWords personnel who

6   provided what looked like an easy path to what should have been essentially automatic approval.

7        46.    However, the next communication PLAINTIFF received from the Lauren

8   Defendants was a 1/23/15 email from Ms. Kwiatkowski requesting the percentages of

9   PLAINTIFF's online vs. in-store sales of Lauren products, with no mention of AdWords, the

10  absence of the link to which was already beginning to eat away at PLAINTIFF's business as she

11  informed Defendants, as PLAINTIFF also explained to Defendants that their request of

12  percentages made no sense in relation to PLAINTIFF's particular business because the website,

13  to a large extent, constituted a "gateway" to the mainstream, lifeblood of PLAINTIFF's business,

14  the individual care and attention PLAINTIFF provided to the particular needs of each client,

15  which, in many cases, involved visits to San Francisco, to PLAINTIFF and to the store itself.

16       47.    In emails of 3/5/15, 3/27/15, 3/31/15, 4/24/15, 4/29/15 and 5/1/15, PLAINTIFF,

17  with increasing desperation, kept asking the Lauren Defendants about AdWords, receiving in

18  response only a 3/9/15 email stating that a "team had taken over the evaluation process, after

19  which they would review the AdWords request - all while PLAINTIFF watched as the effects of

20  not having AdWords was gradually eating away her business, as she was informing Defendants.

21       48.    On May 1, 2015, PLAINTIFF managed to get a Lauren employee, named Sarah

22  Doyle, on the phone, a person not connected with the application process, who told PLAINTIFF

23  that the only known reason for closing an account was "jobbing" (i.e., basically acting as a small-

24  bore middle-man, not selling to the public), which, of course, PLAINTIFF had never done; and

25  that closing an account after it had received approval was basically un-heard-of.

26       49.    On May 6, 2015, PLAINTIFF reached out to Ro Turner for help.

Complaint

50.     On May 8, 2015, PLAINTIFF received an email from Nicholas Manville, of the Lauren Defendants, a person she had never heard of before, who perfunctorily informed her that her account was now closed, as of that date, because the Lauren Defendants had recently re-evaluated their Ralph Lauren Home wholesale and e-commerce network and decided to make changes to their districution.

51.     PLAINTIFF thereupon reached out to whomever she could think of, at the Lauren Defendants and at VICTOR, essentially to no avail.  PLAINTIFF received some dispensation for orders for an uncompleted project; and, on 5/19/15, Mr. Manville emailed her with vague generalizations about (a) the right to terminate "for any lawful reason", (b) allegedly repeated discussions of certain failures, and continued violations, and (c) denials of wrongdoing and unfounded assertions of good faith and equal treatment.

52.     PLAINTIFF's following-day response to this was met by another email from Mr. Manville, containing more, non-specific denials, and the following bogus claims:

a.      That PLAINTIFF had failed to maintain an adequate brick-and-mortar location [which, were it not so truly tragic for PLAINTIFF, would be laughable, in light of PLAINTIFF's location being one of the hottest and most fashionable areas of San Francisco (itself one of the most fashionable locations in the world), and the particulars of her store being of model quality and attractiveness];

b.      That PLAINTIFF had engaged in un-approved, paid online search strategies (again, at least substantively laughable, given PLAINTIFF's assiduous following of the Lauren Defendants' lead in developing her online presence);

c.      Un-approved imagery taken from the Lauren Defendants' marketing site [more awful than laughable in that (a) not only had all PLAINTIFF's imagery been given to PLAINTIFF by the Lauren Defendants but that (b) the Lauren Defendants had been throughout, but especially RECENTLY, been expressly urging the use of this imagery on PLAINTIFF; and

d.      Discounting, contrary to Lauren pricing standards - a truly horrifying

1    accusation in light of the major competitive disadvantage the Lauren Defendants had been

2    placing on PLAINTIFF for years, through the insanely high discounting the Lauren Defendants

3    had been allowing to others, at the same time barring anything close to those levels to

4    PLAINTIFF.

5         53.    PLAINTIFF is informed and believes that many if not all of the dealers of Lauren

6    products of any relation to PLAINTIFF, especially in Northern California, who have not been

7    subject to the above-described burdensome and/or abusive treatment through which PLAINTIFF

8    has suffered, andor who have been given the discounting and/or other advantages denied to

9    PLAINTIFF, were either Gay or Jewish, and that the above-described ill-treatment of

10   PLAINTIFF is likely to have been motivated by prejudice against her as a non-Jewish, Straight

11   woman; and this likelihood is strengthened by the facts, of which PLAINTIFF is informed and

12   believes, that William Li, whose only communications with PLAINTIFF were characterized by

13   nothing but the most abject, and unrelieved hostility, from Day One, is Gay, as is Daniel

14   Strassburger, who, despite being part of the "team" that was announced as being intended to help

15   PLAINTIFF through the "application" process, in fact never offered anything of the sort.

16                **FIRST CAUSE OF ACTION [Breach of Implied Contract]**

17        54.    PLAINTIFF refers to paragraphs 1 through 53, inclusive, of this Complaint and by

18   this reference makes them a part hereof.

19        55.    The above-described events, including both oral and written statements by

20   Defendants, outlined an implied contract, under which PLAINTIFF had the legal right to

21   continue in the described business relationship, barring actual mis-conduct by PLAINTIFF

22   violative of the rights of the Lauren Defendants.

23        56.    PLAINTIFF did not violate the rights of the Lauren Defendants or any other

24   parties.  Rather, PLAINTIFF performed all obligations to Defendants, and each of them, except

25   those obligations PLAINTIFF was prevented or excused from performing.

26        57.    The Lauren Defendants breached PLAINTIFF's above-described contractual

1   rights.

2       58.     As a legal result of the above-described breaches, and through no fault of

3   PLAINTIFF's, PLAINTIFF lost her business that she had built up over 14 years, and the profit

4   from that business, not only after being terminated by Defendants, but also from before that

5   termination, as Defendants' adverse actions toward her continually negatively affected her

6   business, all to the tune of millions of dollars, based on past performance preceding Defendants'

7   breached, in an amount to be proven at trial.

8           WHEREFORE, PLAINTIFF prays judgment as set forth below.

9           **SECOND CAUSE OF ACTION (Promises Without Intent to Perform)**

10      59.     PLAINTIFF refers to paragraphs 1 through 58, inclusive, of this Complaint and by

11  this reference makes them a part hereof.

12      60.     Defendants, and each of them, made the promises to PLAINTIFF that, if she

13  complied with their above-described demands, she would be allowed to continue in the business

14  with Defendants that she had built up over the years.

15      61.     Defendants, and each of them, made these representations with the intent that

16  PLAINTIFF rely upon them, knowing they were false.

17      62.     PLAINTIFF, at the time these representations were made by Defendants and each

18  of them, was ignorant of the falsity of Defendants' representations and believed them to be true.

19  In reliance on these representations, PLAINTIFF was induced to and did comply with

20  Defendants' above-described demands. Had PLAINTIFF known the actual facts, PLAINTIFF

21  would have been able to take alternative actions that would have saved her business.

22  PLAINTIFF's reliance of Defendants' promises was justified because of Defendants' world-wide

23  reputation and the quality its products represented.

24      63.     As a legal and proximate result of the above-alleged conduct of Defendants and

25  each of them, PLAINTIFF was caused to sustain the herein described injuries and damages.

26      64.     Because the conduct of Defendants was despicable, malicious, fraudulent,

17

Complaint

1  oppressive, and done with a conscious disregard of PLAINTIFF's rights and the intent to deny

2  PLAINTIFF her rights, said conduct falls within the meaning of California Civil Code §3294 and

3  PLAINTIFF is entitled to recover punitive damages from Defendants in an amount to be

4  determined at trial.

5       WHEREFORE, PLAINTIFF prays judgment as set forth below.

6              **THIRD CAUSE OF ACTION [Intentional Misrepresentation]**

7       65.    PLAINTIFF refers to paragraphs 1 through 64, inclusive, of this Complaint and by

8  this reference makes them a part hereof.

9       66.    Defendants', and each of their, representations to PLAINTIFF that compliance

10  with Defendants' demands and requests would allow PLAINTIFF to continue in her business

11  were false.

12       67.    Defendants, and each of them, made these representations with the intent that

13  PLAINTIFF rely upon them, knowing they were false.

14       68.    PLAINTIFF, at the time these representations were made by Defendants and each

15  of them, and at the time PLAINTIFF complied with Defendants' demands and requests, was

16  ignorant of the falsity of Defendants' representations and believed them to be true.  In reliance on

17  these representations, PLAINTIFF was induced to and did comply with these demands and

18  requests.  Had PLAINTIFF known the actual facts, PLAINTIFF would have been able to take

19  alternative actions that would have saved her business. PLAINTIFF's reliance of Defendants'

20  representations was justified because of Defendants' world-wide reputation and the quality its

21  products represented.

22       69.    As a legal and proximate result of the above-alleged conduct of Defendants and

23  each of them, Plaintiffs were caused to sustain the herein described injuries and damages.

24       70.    Because the conduct of Defendants was despicable, malicious, fraudulent,

25  oppressive, and done with a conscious disregard of PLAINTIFF's rights and the intent to deny

26  PLAINTIFF her rights, said conduct falls within the meaning of California Civil Code §3294 and

Complaint

1    PLAINTIFF is entitled to recover punitive damages from Defendants in an amount to be

2    determined at trial.

3        WHEREFORE, PLAINTIFF prays judgment as set forth below.

4    **FOURTH CAUSE OF ACTION [Breach of the Covenant of Good Faith and Fair Dealing]**

5        71.    PLAINTIFF refers to paragraphs 1 through 70, inclusive, of this Complaint and by

6    this reference makes them a part hereof.

7        72.    Defendants' conduct described above constituted breaches of the Covenant of

8    Good Faith and Fair Dealing, implied in every contractual relationship.

9        73.    As a legal result of the above-described breaches, and through no fault of

10    PLAINTIFF's, PLAINTIFF lost her business that she had built up over 14 years, and the profit

11    from that business, not only after being terminated by Defendants, but also from before that

12    termination, as Defendants' adverse actions toward her continually negatively affected her

13    business, all to the tune of millions of dollars, based on past performance preceding Defendants'

14    breached, in an amount to be proven at trial.

15        74.    As a further legal result of the above facts, PLAINTIFF has suffered and will

16    continue to suffer general damages in an amount to be proven at trial.

17        75.    Because the conduct of Defendants was despicable, malicious, fraudulent,

18    oppressive, and done with a conscious disregard of PLAINTIFF's rights and the intent to deny

19    PLAINTIFF her rights, said conduct falls within the meaning of California Civil Code §3294 and

20    PLAINTIFF is entitled to recover punitive damages from Defendants in an amount to be

21    determined at trial.

22        WHEREFORE, PLAINTIFF prays judgment as set forth below.

23        **FIFTH CAUSE OF ACTION [Violation of Fiduciary Obligations]**

24        76.    PLAINTIFF refers to paragraphs 1 through 75, inclusive, of this Complaint and by

25    this reference makes them a part hereof.

26        77.    Defendants expressly entered into a partnership relationship with PLAINTIFF for

Complaint

1  their mutual benefit, under which, unlike the usual buyer-seller relationship, the relationship was

2  expressly required to incorporate the input of both sides into its development, and PLAINTIFF

3  was required to adhere strongly to numerous requirements and standards promulgated by

4  Defendants, compliance with which also constituted a condition for continuing in the ongoing

5  business relationship.

6      78.    Such relationships contain fiduciary obligations under which the parties are

7  required to treat each other with the utmost of good faith and fair dealing, including but not

8  limited to the total sharing of all relevant information.

9      79.    From Defendants' conduct described above, it is clear that they were withholding

10  major, life-and-death information from PLAINTIFF, including plots to harm PLAINTIFF, and

11  that those plots, in and of themselves, violated Defendants' above-described duties to treat

12  PLAINTIFF with the utmost good faith and fair dealing.

13      80.    As a legal result of the above-described breaches, and through no fault of

14  PLAINTIFF's, PLAINTIFF lost her business that she had built up over 14 years, and the profit

15  from that business, not only after being terminated by Defendants, but also from before that

16  termination, as Defendants' adverse actions toward her continually negatively affected her

17  business, all to the tune of millions of dollars, based on past performance preceding Defendants'

18  breached, in an amount to be proven at trial.

19      81.    As a further legal result of the above facts, PLAINTIFF has suffered and will

20  continue to suffer general damages in an amount to be proven at trial.

21      82.    Because the conduct of Defendants was despicable, malicious, fraudulent,

22  oppressive, and done with a conscious disregard of PLAINTIFF's rights and the intent to deny

23  PLAINTIFF her rights, said conduct falls within the meaning of California Civil Code §3294 and

24  PLAINTIFF is entitled to recover punitive damages from Defendants in an amount to be

25  determined at trial.

26      WHEREFORE, PLAINTIFF prays judgment as set forth below.

**SIXTH CAUSE OF ACTION [Intentional Wrongdoing - CC 1708]**

83.     PLAINTIFF refers to paragraphs 1 through 82, inclusive, of this Complaint and by this reference makes them a part hereof.

84.     PLAINTIFF is informed and believes, and thereon alleges, that Defendants engaged in the conduct alleged hereinabove intentionally, and with the specific intent of harming PLAINTIFF, seeking to engage in such wrongful conduct without being able to be held liable for it.

85.     As a legal result of the above-described conduct, and through no fault of PLAINTIFF's, PLAINTIFF lost her business that she had built up over 14 years, and the profit from that business, not only after being terminated by Defendants, but also from before that termination, as Defendants' adverse actions toward her continually negatively affected her business, all to the tune of millions of dollars, based on past performance preceding Defendants' breached, in an amount to be proven at trial.

86.     As a further legal result of the above facts, PLAINTIFF has suffered and will continue to suffer general damages in an amount to be proven at trial.

87.     Because the conduct of Defendants was despicable, malicious, fraudulent, oppressive, and done with a conscious disregard of PLAINTIFF's rights and the intent to deny PLAINTIFF her rights, said conduct falls within the meaning of California Civil Code §3294 and PLAINTIFF is entitled to recover punitive damages from Defendants in an amount to be determined at trial.

WHEREFORE, PLAINTIFF prays judgment as set forth below.

**SEVENTH CAUSE OF ACTION [Intentional Infliction of Emotional Distress]**

88.     PLAINTIFF refers to paragraphs 1 through 87, inclusive, of this Complaint and by this reference makes them a part hereof.

89.     Defendants' conduct set forth herein was intended to intimidate and terrify PLAINTIFF, was extreme and outrageous conduct, was done wilfully and with the intent, or in

21

Complaint

1   reckless disregard of the fact, that PLAINTIFF would clearly and foreseeably suffer, and

2   PLAINTIFF has suffered, substantial and severe emotional distress.

3        90.    As a legal result of Defendants' conduct, PLAINTIFF has suffered and continues

4   to suffer embarrassment, humiliation, annoyance, discomfort, pain, apprehension, anxiety and

5   extreme and severe emotional distress, all to her general damage in an amount in excess of the

6   minimum jurisdiction of this Court, the precise amount of which will be determined at trial.

7        91.    As a legal result of Defendants' conduct, Plaintiff has lost and continues to lose

8   her business, all to her special damage in an amount in excess of the minimum jurisdiction of this

9   Court, the precise amount of which will be determined at trial.

10        92.    Because the conduct of Defendants was despicable, malicious, fraudulent,

11   oppressive, and done with a conscious disregard of PLAINTIFF's rights and the intent to deny

12   PLAINTIFF her rights, said conduct falls within the meaning of California Civil Code §3294 and

13   PLAINTIFF is entitled to recover punitive damages from Defendants in an amount to be

14   determined at trial.

15        WHEREFORE, PLAINTIFF prays judgment as set forth below.

16               **EIGHTH CAUSE OF ACTION [Discrimination]**

17        93.    PLAINTIFF refers to paragraphs 1 through 92, inclusive, of this Complaint and by

18   this reference makes them a part hereof.

19        94.    PLAINTIFF is informed and believes that Defendants discriminated against

20   Plaintiff on the basis of gender and ethnicity in violation of Civil Code §§51 and 51.5 by

21   engaging in the course of conduct set forth above.

22        95.    As a legal result of Defendants' discrimination, Plaintiff has suffered and

23   continues to suffer embarrassment, humiliation, annoyance, discomfort, pain, apprehension,

24   fright, tension, anxiety and extreme and severe emotional distress, all to her general damage in an

25   amount in excess of the minimum jurisdiction of this Court, the precise amount of which will be

26   determined at trial.

96.     As a legal result of Defendants' discrimination, Plaintiff has lost and continues to lose her business, all to her special damage in an amount in excess of the minimum jurisdiction of this Court, the precise amount of which will be determined at trial.

97.     Because the conduct of Defendants is despicable, malicious, fraudulent, oppressive, and done with a conscious disregard of the rights and safety of Plaintiff and her daughter, said conduct falls within the meaning of California Civil Code §3294 and Plaintiff is entitled to recover punitive damages from Defendants in an amount to be determined at trial.

98.     As a result of Defendants' discriminatory acts as alleged herein, plaintiff is entitled to reasonable attorney's fees and costs as provided by statute.

WHEREFORE, PLAINTIFF prays judgment as set forth below.

**NINTH CAUSE OF ACTION [Breach of B&P Code 17200 et Seq and 17500 et Seq.]**

99.     PLAINTIFF refers to paragraphs 1 through 98, inclusive, of this Complaint and by this reference makes them a part hereof.

100.     Business and Professions Code section 17200 et seq. prohibit any unlawful, unfair or fraudulent business act or practice, and any act prohibited by Chapter One (commencing with Section 17500) of Part Three of Division Seven of the Business & Professions Code.

101.     At all times material, Defendants breached Business & Professions Code sections 17200 et seq. and 17500 et seq., by the conduct alleged hereinabove.

102.     Pursuant to Business and Professions Code sections 17203 and 17535, Defendants' conduct in breach of Business & Professions Code sections 17200 et seq. and 17500 et seq. subjects Defendants to disgorgement of profits from such breaches.

103.     Because the conduct of Defendants is despicable, malicious, fraudulent, oppressive, and done with a conscious disregard of the rights and safety of Plaintiff and her daughter, said conduct falls within the meaning of California Civil Code §3294 and Plaintiff is entitled to recover punitive damages from Defendants in an amount to be determined at trial.

WHEREFORE, PLAINTIFF prays judgment as set forth below.

Complaint

**TENTH CAUSE OF ACTION (Violation of the Robinson-Patman Act)**

104.    PLAINTIFF refers to paragraphs 1 through 103, inclusive, of this Complaint and by this reference makes them a part hereof.

105.    The Robinson-Patman Act (the Act) prohibits price discrimination on the sale of goods to equally-situated distributors when the effect of such sales is to reduce competition when the effect is substantially to lessen competition.

106.    The price and discount discrimination disadvantaging PLAINTIFF in relation to similarly situated businesses, which is alleged above, comes within the parameters of the Act.

107.    As a legal result of Defendants' discrimination, Plaintiff has lost and continues to lose her business, all to her special damage in an amount in excess of the minimum jurisdiction of this Court, the precise amount of which will be determined at trial.

108.    Because the conduct of Defendants is despicable, malicious, fraudulent, oppressive, and done with a conscious disregard of the rights and safety of Plaintiff and her daughter, said conduct falls within the meaning of California Civil Code §3294 and Plaintiff is entitled to recover punitive damages from Defendants in an amount to be determined at trial.

**ELEVENTH CAUSE OF ACTION (RICO)**

109.    PLAINTIFF refers to paragraphs 1 through 108, inclusive, of this Complaint and by this reference makes them a part hereof.

110.    On the dates alleged hereinabove, and others, Defendants and each of them caused the United States mail and/or electronic instrumentalities of interstate commerce such as telephone, fax and email, under the meaning of 18 U.S.C. 1341, 1342 and 1961(1), to be used for sending and/or receiving communications by and/or to themselves and/or others including but not limited to PLAINTIFF in connection with Defendants', and each of their, scheme, of which PLAINTIFF is informed and believes, to defraud PLAINTIFF of her rights under the laws of the State of California.

111.    PLAINTIFF is informed and believes that these acts were related in their common

24

Complaint

1   objective, or were consistently repeated, and are capable of further repetition.  This conduct

2   constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. 1961(5).

3        112.   The conduct hereinalleged of Defendants and each of them affected interstate

4   commerce in that its use of the above-stated instrumentalities involved goods and services which

5   crossed state and/or international borders.

6        113.   The schemes or artifices of Defendants and each of them to defraud PLAINTIFF

7   of her rights under the laws of the State of California, have involved fraudulent

8   misrepresentations and/or omissions reasonably calculated to deceive persons of ordinary

9   prudence and comprehension.

10       114.   PLAINTIFF is informed and believes that Defendants and each of them engaged

11   in the schemes or artifices outlined above to defraud, and used the U.S. mails for the purpose of

12   executing or attempting to execute such schemes in violation of 18 U.S.C. 1341, which states:

13           Whoever, having devised or intending to devise any scheme or artifice to
         defraud, or for obtaining money or property by means of false or fraudulent
14       pretenses, representations, or promises, or to sell, dispose of, loan, exchange,
         alter, give away, distribute, supply, or furnish or procure for unlawful use any
15       counterfeit or spurious coin, obligation, security, or other article, or anything
         represented to be or intimated or held out to be such counterfeit or spurious
16       article, for the purpose of executing such scheme or artifice or attempting to do so,
         places in any post office or authorized depository for mail matter, any matter or
17       thing whatever to be sent or delivered by the Postal Service, or takes or receives
         therefrom, any such matter or thing, or knowingly causes to be delivered by mail
18       according to the direction thereon, or at the place at which it is directed to be
         delivered by the person to whom it is addressed, any such matter of thing, shall be
19       fined not more than $1000 or imprisoned not more than five years, or both.

20       115.   In the above-described schemes or artifices to defraud of which PLAINTIFF is

21   informed and believes, Defendants and each of them used communications by means of wire,

22   fax, email radio and/or television in interstate commerce, in violation of 18 U.S.C. 1343, which

23   states:

24           Whoever, having devised or intending to devise any scheme or artifice to defraud,
         or for obtaining money or property by means of false or fraudulent pretenses,
25       representations, or promises, transmits or causes to be transmitted by means of
         wire, radio, or television communication in interstate or foreign commerce, any
26       writings, signs, signals, pictures, or sounds for the purpose of executing such
         scheme or artifice, shall be fined not more than $1,000 or imprisoned not more

1    than five years, or both.

2    116.    PLAINTIFF is informed and believes that Defendants and each of them have

3    violated the prohibitions set forth at 18 U.S.C. 1962 (Racketeer Influenced and Corrupt

4    Organizations) by participating in an enterprise affecting commerce through a pattern of specific

5    racketeering activity.  Section 1962 states in pertinent part:

6         (c)    It shall be unlawful for any person employed by or associated with any
          enterprise engaged in, or the activities of which affect, interstate or foreign
7         commerce, to conduct or participate, directly or indirectly, in the conduct of such
          enterprise's affairs through a pattern of racketeering activity  ...
8         (d)    It shall be unlawful for any person to conspire to violate any of the
          provisions of subsection . . .(b) or (c) of this section.
9
10   117.    PLAINTIFF is informed and believes that the enterprise is the undertaking by the

     Defendants and each of them to distribute worldwide the products some of which it was
11
     PLAINTIFF's business to sell.
12
     118.    PLAINTIFF is informed and believes that the knowing and concerted actions of
13
     Defendants and each of them during the dates hereinalleged constitute a pattern of racketeering
14
     activity as defined by 18 U.S.C. 1961.
15
     119.    PLAINTIFF has been injured in her business and/or property by reason of the
16
     violation by Defendants and each of them of 18 U.S.C. 1962, i.e., as a direct and legal result of
17
     the scheme of Defendants and each of them to defraud PLAINTIFF of her rights under the laws
18
     of the State of California.
19
     120.    As a legal result of the hereinalleged conduct of Defendants and each of them,
20
     PLAINTIFF suffered loss of property.
21
     121.    Because the conduct of Defendants is despicable, malicious, fraudulent,
22
     oppressive, and done with a conscious disregard of the rights and safety of Plaintiff and her
23
     daughter, said conduct falls within the meaning of California Civil Code §3294 and Plaintiff is
24
     entitled to recover punitive damages from Defendants in an amount to be determined at trial.
25
                                      **PRAYER**
26
     WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

Complaint

1       For damages to compensate Plaintiff for loss of her business;

2       For other compensatory damages in a sum according to proof;

3       For general damages according to proof;

4       For statutory damages according to proof;

5       For exemplary and punitive damages according to proof;

6       For prejudgment interest according to proof;

7       For Plaintiff's reasonable attorney's fees according to proof;

8       For costs of suit herein incurred; and

9       For such other and further relief that the Court may deem proper.

10    DATED: May 8, 2017

11

12

13                    MICHAEL COHEN

14

15

16

17

18

19

20

21

22

23

24

25

26

Complaint




**Superior Court of California, County of San Francisco**
**Alternative Dispute Resolution**
**Program Information Package**

The plaintiff must serve a copy of the ADR information package
on each defendant along with the complaint. (CRC 3.221(c))

## WHAT IS ADR?

Alternative Dispute Resolution (ADR) is the term used to describe the various options available for settling a dispute without a trial. There are many different ADR processes; the most common forms of which are mediation, arbitration and settlement conferences. In ADR, trained, impartial people decide disputes or help parties decide disputes themselves. They can help parties resolve disputes without having to go to court.

## WHY CHOOSE ADR?

"It is the policy of the Superior Court that every noncriminal, nonjuvenile case participate either in an early settlement conference, mediation, arbitration, early neutral evaluation or some other alternative dispute resolution process prior to trial." (Local Rule 4)

ADR can have a number of advantages over traditional litigation:

- **ADR can save time.** A dispute often can be resolved in a matter of months, even weeks, through ADR, while a lawsuit can take years.
- **ADR can save money.** Including court costs, attorney fees, and expert fees.
- **ADR encourages participation.** The parties may have more opportunities to tell their story than in court and may have more control over the outcome of the case.
- **ADR is more satisfying.** For all the above reasons, many people participating in ADR have reported a high degree of satisfaction.

## HOW DO I PARTICIPATE IN ADR?

Litigants may elect to participate in ADR at any point in a case. General civil cases may voluntarily enter into the court's ADR programs by any of the following means:

- Filing a Stipulation to ADR: Complete and file the Stipulation form (attached to this packet) at the clerk's office located at 400 McAllister Street, Room 103;
- Indicating your ADR preference on the Case Management Statement (also attached to this packet); or
- Contacting the court's ADR office (see below) or the Bar Association of San Francisco's ADR Services at 415-782-8905 or www.sfbar.org/adr for more information.

For more information about ADR programs or dispute resolution alternatives, contact:

Superior Court Alternative Dispute Resolution
400 McAllister Street, Room 103, San Francisco, CA 94102
415-551-3869

*Or, visit the court ADR website at www.sfsuperiorcourt.org*

The San Francisco Superior Court offers different types of ADR processes for general civil matters; each ADR program is described in the subsections below:

## 1) SETTLEMENT CONFERENCES

The goal of settlement conferences is to provide participants an opportunity to reach a mutually acceptable settlement that resolves all or part of a dispute early in the litigation process.

**(A) THE BAR ASSOCIATION OF SAN FRANCISCO (BASF) EARLY SETTLEMENT PROGRAM (ESP):** ESP remains as one of the Court's ADR programs (see Local Rule 4.3) but parties must select the program -- the Court no longer will order parties into ESP.

**Operation:** Panels of pre-screened attorneys (one plaintiff, one defense counsel) each with at least 10 years' trial experience provide a minimum of two hours of settlement conference time, including evaluation of strengths and weakness of a case and potential case value. On occasion, a panelist with extensive experience in both plaintiff and defense roles serves as a sole panelist. BASF handles notification to all parties, conflict checks with the panelists, and full case management. The success rate for the program is 78% and the satisfaction rate is 97%. Full procedures are at: www.sfbar.org/esp.

**Cost:** BASF charges an administrative fee of $295 per party with a cap of $590 for parties represented by the same counsel. Waivers are available to those who qualify. For more information, call Marilyn King at 415-782-8905, email adr@sfbar.org or see enclosed brochure.

**(B) MANDATORY SETTLEMENT CONFERENCES:** Parties may elect to apply to the Presiding Judge's department for a specially-set mandatory settlement conference. See Local Rule 5.0 for further instructions. Upon approval of the Presiding Judge, the court will schedule the conference and assign the case for a settlement conference.

## 2) MEDIATION

Mediation is a voluntary, flexible, and confidential process in which a neutral third party facilitates negotiations. The goal of mediation is to reach a mutually satisfactory agreement that resolves all or part of a dispute after exploring the interests, needs, and priorities of the parties in light of relevant evidence and the law.

**(A) MEDIATION SERVICES OF THE BAR ASSOCIATION OF SAN FRANCISCO,** in cooperation with the Superior Court, is designed to help civil litigants resolve disputes before they incur substantial costs in litigation. While it is best to utilize the program at the outset of litigation, parties may use the program at any time while a case is pending.

**Operation:** Experienced professional mediators, screened and approved, provide one hour of preparation time and the first two hours of mediation time. Mediation time beyond that is charged at the mediator's hourly rate. BASF pre-screens all mediators based upon strict educational and experience requirements. Parties can select their mediator from the panels at www.sfbar.org/mediation or BASF can assist with mediator selection. The BASF website contains photographs, biographies, and videos of the mediators as well as testimonials to assist with the selection process. BASF staff handles conflict checks and full case management. Mediators work with parties to arrive at a mutually agreeable solution. The success rate for the program is 64% and the satisfaction rate is 99%.

**Cost:** BASF charges an administrative fee of $295 per party. The hourly mediator fee beyond the first three hours will vary depending on the mediator selected. Waivers of the administrative fee are available to those who qualify. For more information, call Marilyn King at 415-782-8905, email adr@sfbar.org or see the enclosed brochure.

**(B) JUDICIAL MEDIATION** provides mediation with a San Francisco Superior Court judge for civil cases, which include but are not limited to, personal injury, construction defect, employment, professional malpractice, insurance coverage, toxic torts and industrial accidents. Parties may utilize this program at anytime throughout the litigation process.

**Operation:** Parties interested in judicial mediation should file a Stipulation to Judicial Mediation indicating a joint request for inclusion in the program. A preference for a specific judge may be indicated. The court will coordinate assignment of cases for the program. There is no charge for the Judicial Mediation program.

**(C) PRIVATE MEDIATION:** Although not currently a part of the court's ADR program, parties may elect any private mediator of their choice; the selection and coordination of private mediation is the responsibility of the parties. Parties may find mediators and organizations on the Internet. The cost of private mediation will vary depending on the mediator selected.

## 3) ARBITRATION

An arbitrator is neutral attorney who presides at a hearing where the parties present evidence through exhibits and testimony. The arbitrator applies the law to the facts of the case and makes an award based upon the merits of the case.

**(A) JUDICIAL ARBITRATION:** When the court orders a case to arbitration it is called "judicial arbitration". The goal of arbitration is to provide parties with an adjudication that is earlier, faster, less formal, and usually less expensive than a trial.

**Operation:** Pursuant to CCP 1141.11, all civil actions in which the amount in controversy is $50,000 or less, and no party seeks equitable relief, shall be ordered to arbitration. (Upon stipulation of all parties, other civil matters may be submitted to judicial arbitration.) An arbitrator is chosen from the court's arbitration panel. Arbitrations are generally held between 7 and 9 months after a complaint has been filed. Judicial arbitration is not binding unless all parties agree to be bound by the arbitrator's decision. Any party may request a trial within 60 days after the arbitrator's award has been filed. Local Rule 4.2 allows for mediation in lieu of judicial arbitration, so long as the parties file a stipulation to mediate after the filing of a complaint. There is no cost to the parties for judicial arbitration.

**(B) PRIVATE ARBITRATION:** Although not currently a part of the court's ADR program, civil disputes may also be resolved through private arbitration. Here, the parties voluntarily consent to arbitration. If all parties agree, private arbitration may be binding and the parties give up the right to judicial review of the arbitrator's decision. In private arbitration, the parties select a private arbitrator and are responsible for paying the arbitrator's fees.

TO PARTICIPATE IN ANY OF THE COURT'S ADR PROGRAMS, PLEASE COMPLETE THE ATTACHED STIPULATION TO ADR AND SUBMIT IT TO THE COURT. YOU MUST ALSO CONTACT BASF TO ENROLL IN THE LISTED BASF PROGRAMS. THE COURT DOES NOT FORWARD COPIES OF STIPULATIONS TO BASF.



# Superior Court of California
## County of San Francisco



HON. TERI L. JACKSON
PRESIDING JUDGE

## Judicial Mediation Program

JENIFFER B. ALCANTARA
ADR ADMINISTRATOR

The Judicial Mediation program offers mediation in civil litigation with a San Francisco Superior Court judge familiar with the area of the law that is the subject of the controversy. Cases that will be considered for participation in the program include, but are not limited to personal injury, professional malpractice, construction, employment, insurance coverage disputes, mass torts and complex commercial litigation. Judicial Mediation offers civil litigants the opportunity to engage in early mediation of a case shortly after filing the complaint in an effort to resolve the matter before substantial funds are expended. This program may also be utilized at anytime throughout the litigation process. The panel of judges currently participating in the program includes:

The Honorable Suzanne R. Bolanos
The Honorable Angela Bradstreet
The Honorable Andrew Y.S. Cheng
The Honorable Samuel K. Feng
The Honorable Curtis E.A. Karnow
The Honorable Charlene P. Kiesselbach

The Honorable Stephen M. Murphy
The Honorable Joseph M. Quinn
The Honorable James Robertson, II
The Honorable John K. Stewart
The Honorable Richard B. Ulmer, Jr.
The Honorable Mary E. Wiss

Parties interested in Judicial Mediation should file a Stipulation to Judicial Mediation indicating a joint request for inclusion in the program and deliver a courtesy copy to Department 610. A preference for a specific judge may be indicated on the request, and although not guaranteed due to the judge's availability, every effort will be made to fulfill the parties' choice for a particular judge. Please allow at least 30 days from the filing of the form to receive the notice of assignment. The court's Alternative Dispute Resolution Administrator will facilitate assignment of cases that qualify for the program.

Note: Space and availability is limited. Submission of a stipulation to Judicial Mediation does *not* guarantee inclusion in the program. You will receive written notification from the court as to the outcome of your application.

### Alternative Dispute Resolution
400 McAllister Street, Room 103, San Francisco, CA 94102
(415) 551-3869

07/2017 (ja)

## EJT-001-INFO   Expedited Jury Trial Information Sheet

This information sheet is for anyone involved in a civil lawsuit who will be taking part in an expedited jury trial—a trial that is shorter and has a smaller jury than a traditional jury trial.

You can find the law and rules governing expedited jury trials in Code of Civil Procedure sections 630.01–630.29 and in rules 3.1545–3.1553 of the California Rules of Court. You can find these at any county law library or online. The statutes are online at *http://leginfo.legislature.ca.gov/faces/codes.xhtml*. The rules are at *www.courts.ca.gov/rules*.

### ① What is an expedited jury trial?

An expedited jury trial is a short trial, generally lasting only one or two days. It is intended to be quicker and less expensive than a traditional jury trial.

As in a traditional jury trial, a jury will hear your case and will reach a decision about whether one side has to pay money to the other side. An expedited jury trial differs from a regular jury trial in several important ways:

- **The trial will be shorter.** Each side has 5 hours to pick a jury, put on all its witnesses, show the jury its evidence, and argue its case.
- **The jury will be smaller.** There will be 8 jurors instead of 12.
- **Choosing the jury will be faster.** The parties will exercise fewer challenges.

### ② What cases have expedited jury trials?

- **Mandatory expedited jury trials.** All limited civil cases—cases where the demand for damages or the value of property at issue is $25,000 or less—come within the *mandatory expedited jury trial* procedures. These can be found in the Code of Civil Procedure, starting at section 630.20. Unless your case is an unlawful detainer (eviction) action, or meets one of the exceptions set out in the statute, it will be within the expedited jury trial procedures. These exceptions are explained more in ⑥ below.
- **Voluntary expedited jury trials.** If your civil case is not a limited civil case, or even if it is, you can choose to take part in a *voluntary expedited jury trial*. If all the parties agree to do so. Voluntary expedited jury trials have the same shorter time frame and smaller jury that the

mandatory ones do, but have one other important aspect—all parties must waive their rights to appeal. In order to help keep down the costs of litigation, there are no appeals following a *voluntary* expedited jury trial except in very limited circumstances. These are explained more fully in ⑤.

### ③ Will the case be in front of a judge?

The trial will take place at a courthouse and a judge, or, if you agree, a temporary judge (a court commissioner or an experienced attorney that the court appoints to act as a judge) will handle the trial.

### ④ Does the jury have to reach a unanimous decision?

No. Just as in a traditional civil jury trial, only three-quarters of the jury must agree in order to reach a decision in an expedited jury trial. With 8 people on the jury, that means that at least 6 of the jurors must agree on the verdict in an expedited jury trial.

### ⑤ Is the decision of the jury binding on the parties?

Generally, yes, but not always. A verdict from a jury in an expedited jury trial is like a verdict in a traditional jury trial. The court will enter a judgment based on the verdict, the jury's decision that one or more defendants will pay money to the plaintiff or that the plaintiff gets no money at all.

But parties in an expedited jury trial, (like in other kinds of trials, are allowed to make an agreement before the trial that guarantees that the defendant will pay a certain amount to the plaintiff even if the jury decides on a lower payment or no payment. That agreement may also put a cap on the highest amount that a defendant has to pay, even if the jury decides on a higher amount. These agreements are known as "high/low agreements." You should discuss with your attorney whether you should enter into such an agreement in your case and how it will affect you.

### ⑥ How else is an expedited jury trial different?

The goal of the expedited jury trial process is to have shorter and less expensive trials.

- The cases that come within the mandatory expedited jury trial procedures are all limited civil actions, and they must proceed under the limited discovery and

Judicial Council of California, *www.courts.ca.gov*
Revised July 1, 2016, Mandatory Form
Code of Civil Procedure, § 630.01–630.10
Cal. Rules of Court, rules 3.1545–3.1553

**EJT-001-INFO**    **Expedited Jury Trial Information Sheet**

pretrial rules that apply to those actions. See Code of Civil Procedure sections 90–100.

- The voluntary expedited jury trial rules set up some special procedures to help those cases have shorter and less expensive trials. For example, the rules require that several weeks before the trial takes place, the parties show each other all exhibits and tell each other what witnesses will be at the trial. In addition, the judge will meet with the attorneys before the trial to work out some things in advance.

The other big difference is that the parties in either kind of expedited jury trial can make agreements about how the case will be tried so that it can be tried quickly and effectively. These agreements may include what rules will apply to the case, how many witnesses can testify for each side, what kind of evidence may be used, and what facts the parties already agree to and so do not need the jury to decide. The parties can agree to modify many of the rules that apply to trials generally or to any pretrial aspect of the expedited jury trials.

 **Do I have to have an expedited jury trial if my case is for $25,000 or less?**

Not always. There are some exceptions.

- The mandatory expedited jury trial procedures do not apply to any unlawful detainer or eviction case.
- Any party may ask to opt out of the procedures if the case meets any of the criteria set out in Code of Civil Procedure section 630.20(b), all of which are also described in item 2 of the *Request to Opt Out of Mandatory Expedited Jury Trial* (form EJT-003). Any request to opt out must be made on that form, and it must be made within a certain time period, as set out in Cal. Rules of Court, rule 3.1546(c). Any opposition must be filed within 15 days after the request has been served.

> *The remainder of this information sheet applies only to voluntary expedited jury trials.*

 **Who can take part in a voluntary expedited jury trial?**

The process can be used in any civil case that the parties agree may be tried in one or two days. To have a voluntary expedited jury trial, both sides must want one. Each side must agree to all the rules described in (9), and to waive most appeal rights. The agreements between the parties must be put into writing in a

document called *[Proposed] Consent Order for Voluntary Expedited Jury Trial*, which will be submitted to the court for approval. (Form EJT-020 may be used for this.) The court must issue the consent order as proposed by the parties unless the court finds good cause why the action should not proceed through the expedited jury trial process.

 **Why do I give up most of my rights to an appeal in a voluntary expedited jury trial?**

To keep costs down and provide a faster end to the case, all parties who agree to take part in a voluntary expedited jury trial must agree to waive the right to appeal the jury verdict or decisions by the judicial officer concerning the trial unless one of the following happens:

- Misconduct of the judicial officer that materially affected substantial rights of a party;
- Misconduct of the jury; or
- Corruption or fraud or some other bad act that prevented a fair trial.

In addition, parties may not ask the judge to set the jury verdict aside, except on those same grounds. Neither you nor the other side will be able to ask for a new trial on the grounds that the jury verdict was too high or too low, that legal mistakes were made before or during the trial, or that new evidence was found later.

 **Can I change my mind after agreeing to a voluntary expedited jury trial?**

No, unless the other side or the court agrees. Once you and the other side have agreed to take part in a voluntary expedited jury trial, that agreement is binding on both sides. It can be changed only if both sides want to change it or stop the process or if a court decides there are good reasons the voluntary expedited jury trial should not be used in the case. This is why it is important to talk to your attorney before agreeing to a voluntary expedited jury trial. This information sheet does not cover everything you may need to know about voluntary expedited jury trials. It only gives you an overview of the process and how it may affect your rights. You should discuss all the points covered here and any questions you have about expedited jury trials with an attorney before agreeing to a voluntary expedited jury trial.

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name and address) | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.: | |
| ATTORNEY FOR (Name): | |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO 400 McAllister Street San Francisco, CA 94102-4514 | |
| PLAINTIFF/PETITIONER: | |
| DEFENDANT/RESPONDENT: | |
| STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION (ADR) | CASE NUMBER: DEPARTMENT 610 |

1) **The parties hereby stipulate that this action shall be submitted to the following ADR process:**

☐ **Early Settlement Program of the Bar Association of San Francisco (BASF)** - Pre-screened experienced attorneys provide a minimum of 2 hours of settlement conference time for a BASF administrative fee of $295 per party. Waivers are available to those who qualify. BASF handles notification to all parties, conflict checks with the panelists, and full case management. www.sfbar.org/esp

☐ **Mediation Services of BASF** - Experienced professional mediators, screened and approved, provide one hour of preparation and the first two hours of mediation time for a BASF administrative fee of $295 per party. Mediation time beyond that is charged at the mediator's hourly rate. Waivers of the administrative fee are available to those who qualify. BASF assists parties with mediator selection, conflicts checks and full case management. www.sfbar.org/mediation

☐ **Private Mediation** - Mediators and ADR provider organizations charge by the hour or by the day, current market rates. ADR organizations may also charge an administrative fee. Parties may find experienced mediators and organizations on the Internet.

☐ **Judicial Arbitration** - Non-binding arbitration is available to cases in which the amount in controversy is $50,000 or less and no equitable relief is sought. The court appoints a pre-screened arbitrator who will issue an award. There is no fee for this program. www.sfsuperiorcourt.org

☐ **Judicial Mediation** - The Judicial Mediation program offers mediation in civil litigation with a San Francisco Superior Court judge familiar with the area of the law that is the subject of the controversy. There is no fee for this program. www.sfsuperiorcourt.org

Judge Requested (see list of Judges currently participating in the program): _____

Date range requested for Judicial Mediation (from the filing of stipulation to Judicial Mediation):

☐ 30-90 days   ☐ 90-120 days   ☐ Other (please specify) _____

☐ **Other ADR process (describe)** _____

2) The parties agree that the ADR Process shall be completed by (date): _____

3) Plaintiff(s) and Defendant(s) further agree as follows:



Name of Party Stipulating                          Name of Party Stipulating


Name of Party or Attorney Executing Stipulation     Name of Party or Attorney Executing Stipulation


Signature of Party or Attorney                      Signature of Party or Attorney

☐ Plaintiff ☐ Defendant ☐ Cross-defendant          ☐ Plaintiff ☐ Defendant ☐ Cross-defendant

Dated: _____                             Dated: _____

☐ *Additional signature(s) attached*

ADR-2  03/15                     **STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION**

CM-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| TELEPHONE NO.:                         FAX NO.: (Optional): | |
| E-MAIL ADDRESS (Optional): | |
| ATTORNEY FOR (Name): | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF
STREET ADDRESS:
MAILING ADDRESS:
CITY AND ZIP CODE:
BRANCH NAME:

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| CASE MANAGEMENT STATEMENT | CASE NUMBER: |
|---|---|
| (Check one):  ☐ UNLIMITED CASE          ☐ LIMITED CASE | |
| (Amount demanded              (Amount demanded is $25,000 | |
| exceeds $25,000)               or less) | |

A CASE MANAGEMENT CONFERENCE is scheduled as follows:

Date:                    Time:                    Dept.:                    Div.:                    Room:

Address of court (if different from the address above):

☐ Notice of Intent to Appear by Telephone, by (name):

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

1. Party or parties (answer one):
   a. ☐ This statement is submitted by party (name):
   b. ☐ This statement is submitted jointly by parties (names):

2. Complaint and cross-complaint (to be answered by plaintiffs and cross-complainants only)
   a. The complaint was filed on (date):
   b. ☐ The cross-complaint, if any, was filed on (date):

3. Service (to be answered by plaintiffs and cross-complainants only)
   a. ☐ All parties named in the complaint and cross-complaint have been served, have appeared, or have been dismissed.
   b. ☐ The following parties named in the complaint or cross-complaint
      (1) ☐ have not been served (specify names and explain why not):
      (2) ☐ have been served but have not appeared and have not been dismissed (specify names):
      (3) ☐ have had a default entered against them (specify names):
   c. ☐ The following additional parties may be added (specify names, nature of involvement in case, and date by which they may be served):

4. Description of case
   a. Type of case in ☐ complaint    ☐ cross-complaint    (Describe, including causes of action):

---

| Form Adopted for Mandatory Use | CASE MANAGEMENT STATEMENT | Page 1 of 6 |
|---|---|---|
| Judicial Council of California | | Cal. Rules of Court, |
| CM-110 [Rev. July 1, 2011] | | rules 3.720–3.730 |
| | | www.courts.ca.gov |

**CM-110**

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

4.  b.   Provide a brief statement of the case, including any damages. *(If personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date [indicate source and amount], estimated future medical expenses, lost earnings to date, and estimated future lost earnings. If equitable relief is sought, describe the nature of the relief.)*

☐  *(If more space is needed, check this box and attach a page designated as Attachment 4b.)*

5.  **Jury or nonjury trial**
The party or parties request  ☐ a jury trial  ☐ a nonjury trial.   *(If more than one party, provide the name of each party requesting a jury trial):*

6.  **Trial date**
a.  ☐  The trial has been set for *(date):*
b.  ☐  No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint *(if not, explain):*

c.  Dates on which parties or attorneys will not be available for trial *(specify dates and explain reasons for unavailability):*

7.  **Estimated length of trial**
The party or parties estimate that the trial will take *(check one):*
a.  ☐  days *(specify number):*
b.  ☐  hours (short causes) *(specify):*

8.  **Trial representation** *(to be answered for each party)*
The party or parties will be represented at trial  ☐ by the attorney or party listed in the caption  ☐ by the following:
a.  Attorney:
b.  Firm:
c.  Address:
d.  Telephone number:
e.  E-mail address:
☐  Additional representation is described in Attachment 8.
f.  Fax number:
g.  Party represented:

9.  **Preference**
☐  This case is entitled to preference *(specify code section):*

10.  **Alternative dispute resolution (ADR)**
a.  **ADR information package.** Please note that different ADR processes are available in different courts and communities; read the ADR information package provided by the court under rule 3.221 for information about the processes available through the court and community programs in this case.
    (1)  For parties represented by counsel: Counsel  ☐ has  ☐ has not   provided the ADR information package identified in rule 3.221 to the client and reviewed ADR options with the client.
    (2)  For self-represented parties: Party  ☐ has  ☐ has not  reviewed the ADR information package identified in rule 3.221.
b.  **Referral to judicial arbitration or civil action mediation** *(if available).*
    (1)  ☐  This matter is subject to mandatory judicial arbitration under Code of Civil Procedure section 1141.11 or to civil action mediation under Code of Civil Procedure section 1775.3 because the amount in controversy does not exceed the statutory limit.
    (2)  ☐  Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.
    (3)  ☐  This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court or from civil action mediation under Code of Civil Procedure section 1775 et seq. *(specify exemption):*

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

10.  c.  Indicate the ADR process or processes that the party or parties are willing to participate in, have agreed to participate in, or
have already participated in *(check all that apply and provide the specified information):*

| | The party or parties completing this form are willing to participate in the following ADR processes *(check all that apply):* | If the party or parties completing this form in the case have agreed to participate in or have already completed an ADR process or processes, indicate the status of the processes *(attach a copy of the parties' ADR stipulation):* |
|---|---|---|
| (1) Mediation | ☐ | ☐ Mediation session not yet scheduled <br> ☐ Mediation session scheduled for *(date):* <br> ☐ Agreed to complete mediation by *(date):* <br> ☐ Mediation completed on *(date):* |
| (2) Settlement conference | ☐ | ☐ Settlement conference not yet scheduled <br> ☐ Settlement conference scheduled for *(date):* <br> ☐ Agreed to complete settlement conference by *(date):* <br> ☐ Settlement conference completed on *(date):* |
| (3) Neutral evaluation | ☐ | ☐ Neutral evaluation not yet scheduled <br> ☐ Neutral evaluation scheduled for *(date):* <br> ☐ Agreed to complete neutral evaluation by *(date):* <br> ☐ Neutral evaluation completed on *(date):* |
| (4) Nonbinding judicial arbitration | ☐ | ☐ Judicial arbitration not yet scheduled <br> ☐ Judicial arbitration scheduled for *(date):* <br> ☐ Agreed to complete judicial arbitration by *(date):* <br> ☐ Judicial arbitration completed on *(date):* |
| (5) Binding private arbitration | ☐ | ☐ Private arbitration not yet scheduled <br> ☐ Private arbitration scheduled for *(date):* <br> ☐ Agreed to complete private arbitration by *(date):* <br> ☐ Private arbitration completed on *(date):* |
| (6) Other *(specify):* | ☐ | ☐ ADR session not yet scheduled <br> ☐ ADR session scheduled for *(date):* <br> ☐ Agreed to complete ADR session by *(date):* <br> ☐ ADR completed on *(date):* |

| | CM-110 |
|---|---|
| PLAINTIFF/PETITIONER: | CASE NUMBER: |
| DEFENDANT/RESPONDENT: | |

**11. Insurance**
   a. ☐ Insurance carrier, if any, for party filing this statement *(name)*:
   b. Reservation of rights: ☐ Yes ☐ No
   c. ☐ Coverage issues will significantly affect resolution of this case. *(explain)*:

**12. Jurisdiction**
   Indicate any matters that may affect the court's jurisdiction or processing of this case and describe the status.
   ☐ Bankruptcy   ☐ Other *(specify)*:
   Status:

**13. Related cases, consolidation, and coordination**
   a. ☐ There are companion, underlying, or related cases.
      (1) Name of case:
      (2) Name of court:
      (3) Case number:
      (4) Status:
      ☐ Additional cases are described in Attachment 13a.
   b. ☐ A motion to ☐ consolidate ☐ coordinate   will be filed by *(name party)*:

**14. Bifurcation**
   ☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons)*:

**15. Other motions**
   ☐ The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues)*:

**16. Discovery**
   a. ☐ The party or parties have completed all discovery.
   b. ☐ The following discovery will be completed by the date specified *(describe all anticipated discovery)*:
      Party          Description          Date

   c. ☐ The following discovery issues, including issues regarding the discovery of electronically stored information, are anticipated *(specify)*:

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**17. Economic litigation**

a. ☐ This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90-98 will apply to this case.

b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed *(if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case):*

**18. Other issues**

☐ The party or parties request that the following additional matters be considered or determined at the case management conference *(specify):*

**19. Meet and confer**

a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court *(if not, explain):*

b. After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following *(specify):*

**20. Total number of pages attached** *(if any):* _____

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and alternative dispute resolution, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date:

_____
(TYPE OR PRINT NAME)

_____
(SIGNATURE OF PARTY OR ATTORNEY)

_____
(TYPE OR PRINT NAME)

_____
(SIGNATURE OF PARTY OR ATTORNEY)

☐ Additional signatures are attached.

**CASE MANAGEMENT STATEMENT**