Michael Cohen - #98066
Attorney at Law
1126½ Delaware
Berkeley, CA 94702
510/5599-8707
Fax: 510/525-9615
mikecohen@sprintmail.com

Attorney for Plaintiff

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| Victoria Card, | No. 3:18-cv-02553-JSC |
| Plaintiff, | PLAINTIFF'S BRIEF ON DISCOVERY ISSUES [1] |
| vs. | |
| Ralph Lauren Corporation, Ralph Lauren Company West, LLC, E. J. Victor, Inc., and DOES 1-100, | |
| Defendants. | |

OUTLINE

    A.    There are two basic issues before the Court:

        1.    Extending discovery, and

        2.    The form of the PMK Deposition Notices.

    B.    Central to the first issue are the facts (*which the Supreme Court has mandated must be adjudicated in the context of "the totality of the circumstances"*) that:

        1.    There is neither any trial date nor dispositive motion date pending (*the

---

[1] When putting this brief together, Plaintiff's counsel saw, to his horror, that another deadline had passed on the same date as pertains to the depositions, namely the expert disclosure date, as to which, in fact, the defense has long since known both the identity of the expert (*an economist who consulted on Plaintiff's earning-capacity loss*) and the contents of his work (*i.e., the earnings loss calculations that were detailed in both the Mediation brief in March 2019, and the Mandatory Settlement Conference brief of earlier this month*). Since the issues as to the same missed date for both discovery procedures are exactly the same, the expert disclosure issue is made part of this brief.

*court having vacated the original May 2021 trial date stating that the pandemic had detrimentally affected the court's calendar to such an extent that, even if other circumstances before the court had not mandated vacating the original date, it would have to be vacated anyhow*), with no further indications forthcoming of what a continued date might be [*such that THERE IS ABSOLUTELY NO COGNIZABLE PREJUDICE [²], from the extension of time here requested, TO EITHER THE COURT OR OPPOSING COUNSEL*]; and

    2.    The confusing manner in which the scheduling in this case developed, along with the attendant severe squeezing of the time plaintiff had to conduct discovery, created serious traps into which Plaintiff's counsel, a sole practitioner admittedly somewhat inexperienced in federal litigation, fell.

Because the issue involved in this motion is so crucial to the future of this case, the details of these developments, and the traps are listed here, in this Introduction, as follows:

On 2/13/20 [³], among other things:

Trial was set for 5/17/21, with all the other dates tied to it:

Initial Disclosure 4/6/20

Fact discovery cutoff 10/6

Dispositive motions 1/21/21

Expert Disclosure Deadline: 2/16/21

Expert Discovery Deadline 3/30/21

Final Pretrial Conference 4/29/21

Further Case Mgt Cnf (CMC): 5/28/20

4/2/20

Initial Disclosure was changed to 6/5/20

Fact discovery cutoff to 12/7

---

²    (*as opposed to* losing the chance to win the case on procedural technicalities that, in the actual circumstances, have little to no bearing on fairness to anybody)

³    [before which date, it had not been possible to serve discovery, since settlement of the pleadings had been delayed by 3 consecutive 12b(6) motions]

| | |
|---|---|
| 1 | Dispositive Motions to 2/81/21 |
| 2 | Expert Disclosure Deadline: 3/1/21 |
| 3 | Expert Discovery Deadline 4/12/21 |
| 4 | Final Pretrial Conference 4/29/21 |
| 5 | 4/23/20 |
| 6 | Further CMC to 7/23/20 |
| 7 | 7/30/20 |
| 8 | Meet & Confer & Joint Letter Brief re remaining discovery |

disputes (NB: 7/30/20 turned out to be BEFORE Defendant had even STARTED responding to Plaintiff's extensive production requests - which had been served ca. 2 months previously).

Further CMC to 10/29/20

11/19/20

Δs had just finished producing their documents [*over 15,000 pages, IN NO RECOGNIZABLE ORDER, the significant majority coming toward the end*] - the discovery request for which, again, had been served more than 5 months previously, and the documents produced from which were intended by Plaintiff to form the basis of the rest of Plaintiff's discovery.

Fact Discovery Deadline to 3/31/21

VACATE the Dispositive Motion & Trial Dates - with nothing stated re Expert Disclosure or Discovery

Further CMC to 1/28/21

Joint CMS to 1/21/21

Case referred to Mandatory Settlement Conference (MSC) - over the parties' assertions that (a) for Defendants, that they had no intention of settling, and (b) for Plaintiff, that the parties were way too far apart

11/20/20

MSC-date setting conference: 12/3/20

11/27/20

|   |   |
|---|---|
| MSC Statement Deadline | 12/4/20 |
| MSC set for 2/17/21 | 12/9/20 |
| CMC to 3/4/21 | |
| JOINT CMS 2/25/21 | 2/3/21 |
| MSC to 3/3/21 | |
| MSC Statement to 2/27/21 | 2/16/21 |
| CMC: 4/1/21 | |
| Joint CMS 3/25/21 | 3/11/21 |
| Minute Order: Meet & Confer 3/11/21, & Hearing 3/20/21, but nothing re either the interim dates or the request for tentative deposition dates | |
| Letter Brief to change briefing and hearing and CMC | |

As will be detailed below: Due to the combination of **(a)** the extensive necessary organization and analysis of more than 15,000 (*substantially disorganized*) documents (*plus the entirety of Plaintiff's document production*) being squeezed by **(i)** the settlement conference [*and its numerous continuances past a major deadline, 3/1/21, <u>for BOTH the Fact Discovery Pre-Cutoff AND the Expert Disclosure Deadline</u>, neither of which were ever adverted to in the plethora of subsequent scheduling changes, and consequently lost-track-of by Plaintiff's counsel*] and by **(ii)** other developments, into not enough time for plaintiff to finish, and **(b)** the confusion engendered in Plaintiff's counsel by Trial and Dispositive Motion dates being vacated (*with no indication as to new dates for them*), so it was, below the radar, unclear why the Fact Discovery deadline and the Expert Discovery Deadlines had not been vacated with the Trial date, and were still on calendar - with all of this taking place in a procedural context wherein **(A)** there were numerous stipulations for continuances, **(B)** the few times stipulations

were not reached, the continuances were granted, **(C)** there was no trial date or dispositive motion date, **(D)** Plaintiff's counsel was, at all times, continuing attempts to put together the discovery he had stated in numerous documents served on both court and counsel that he intended to promulgate, **(E)** the numerous continuances that pushed the MSC past the aforesaid almost vestigial date of the above two important deadlines, and **(F)** Plaintiff actually met the FRCP deadlines and time limits for the deposition notices (*which were foremost in Plaintiff's counsel's thinking*): Plaintiff's counsel's in-passing consciousness of these deadlines did not rise to the level where a request had to be made to continue them OR ELSE!

So now, that it turns out that much, if not most, or even all of the entire case turns on what amounts to a few days of missed deadline amidst a tsunami of work, just on this case alone, for Plaintiff's sole-practitioner counsel, he begs the court for the necessary continuances of these two major deadlines which fell a very short time ago, on 3/1/21.

C.    Central to the PMK Form issue is the peculiar relevant standards, and the particular circumstances of the instant case, as follows:

1.    The law is that specificity of the categories is greatly preferred. The phrase "describe with reasonable particularity the matters on which examination is requested" has been interpreted as requiring "painstaking specificty" [*Sprint Communications Co., L.P. v. Theglobe.com, Inc.* (D KS 2006) 236 FRD 524, 528]; and specification has been held to be the better practice because the examining party is likely to get "I don't know" answers on matters not specified in their notice [See *King v. Pratt & Whitney a Div. of United Technologies Corp.* (SD FL 1995) 161 FRD 475, 476, aff'd without opn. (11th Cir. 2000) 213 F3d 646]. In addition, a PMK deponent must provide any relevant information of which he or she has knowledge, including matters outside the scope of Rule 30(b)(6) [See *Detoy v. City & County of San Francisco* (ND CA 2000) 196 FRD 362, 367]

2.    The particular circumstances of the case are that the case consists of:

a.    Years of communications between and among the parties, which are essentially set forth in the Complaint and are for the most part contained in emails and other writings which have been produced, and

5

    b. A limited number of nodes of events, around which these communications tended to cluster, which, upon analysis, comprise the main events of the duties and breaches claimed, all of which has been expressly manifested to Defendants on numerous occasions, and in numerous contexts, and which has been re-summarized in recent "meet and confer" communications as follows:

      (1) When Plaintiff (*a decades-long devotee and high-producing wholesaler and world ambassador of Defendant's home products*) complained, from ca. 2010, about the unfair advantages a competitor was being given,

      (2) Defendants retaliated, in an ongoing way, and over time, with false accusations (*which Plaintiff promptly refuted*), and threats to terminate Plaintiff,

      (3) With a termination actually communicated in late 2013,

      (4) Only to be rescinded, within days, by means of an agreement that Plaintiff would do, as to her store and website, whatever Defendants told her to do, so she could thereafter continue with the same, interdependently successful business she had been doing for so long,

      (5) Plaintiff's performance of which agreement was completed a year later with great praise from Defendants' personnel working with her on the issues,

      (6) Only to be followed IMMEDIATELY THERAFTER by Defendants' refusal to allow Plaintiff to use the name Ralph Lauren in her Google Ads [*which she had always previously used (as did, and do, numerous other retailers who produced nothing near the revenue for Defendants as Plaintiff had), and which is central to doing business on the net*], the effect of which refusal was to send her business into a steep downward spiral (*during which Defendants assiduously stonewalled Plaintiff's increasingly desperate pleas for the permission*), UNTIL

      (7) In May 2015, Defendants had someone with no previous connection with Plaintiff (*and who left the company shortly thereafter*), terminate her, without stating a reason, until, after being pushed, he stated the same false accusations that had been resolved by the aforesaid agreement and Plaintiff's performance of her part of it which had

been highly praised by Defendants.

      (8) This totally destroyed Plaintiff's, 6-figure annual profit, business.

  c. So, what Plaintiff's original PMK did was, basically, to make each of the above nodes, and each of the numerous emails relating to them, into categories, with the idea that:

      (1) It was obvious who the PMKs would be, since they were involved in the emails, and

      (2) Since the very specific emails constitute essentially a roadmap to the deposition questions, no one would be in the dark as to the meaning of the categories.

      So, when Defendants, from the get, said there were too many categories, Plaintiff basically cut them in half by consolidating the categories, shoe-horning them more into the above nodes, and leaving enough details to avoid vagueries, while also pointing out that, at this point:

      (3) Defendants could just make up whatever categories they'd like (*because the original PMK categories were so specific that the questions that would be asked would be totally obvious*); and

      (4) Further, the individuals named in the individual deposition notices would so very likely be almost entirely the same as the PMKs, that two very efficient things would follow:

        (a) The PMK Deposition might not be necessary almost at all, and

        (b) The number of depositions would hove very closely to the seven individual deponents, making scheduling not much of a problem.

  3. So:

    a. Under these circumstances: the original proliferation of categories was considerably more help to Defendants than one would usually get in a PMK Deposition.

b. Then, as to the defense's other main PMK category assertion (*i.e., that the categories, instead of being too specific, are too broad, i.e., running a game in which any category can be claimed to be one or the other*), the law is that, even with just the above reduced node categories, the requirement that the deposition notice or subpoena describe the examination matters does not limit the scope of the questions that can be asked of the corporation's designated representative. Any question "relevant to the claim or defense of any party" may be asked even if not specified in the deposition notice [*King v. Pratt & Whitney a Div. of United Technologies Corp.*, *supra*; *Detoy v. City & County of San Francisco*, *supra*, at 366-367; *Philbrick v. Enom, Inc.* (D NH 2009) 593 FS2d 352, 363, fn. 16]

So, the main technique along this line complained of by the defense (*i.e., the listing of an event, plus the facts surrounding it, or the use of the phrase "including but not limited to"*) is, again, actually an assist to the process beyond that which one would usually get in a PMK Deposition, since one is entitled to ask the questions to that extent of breadth anyhow.

c. More specifically, the defense lists 12 specific categories [2, 4, 5, 9, 10, 16, 17, 18, 19, 33, 34, and 41] they claim "are not related to Plaintiff's contract claims, or her claims under the Robinson-Patman Act", which assertion by the defense turns out to be, even on the most cursory glance, totally bogus, as follows:

2. **The December 2001 approval of Plaintiff's account**: Throughout the events of the case, Defendants regularly, falsely accused Plaintiff of doing various things without authorization, when the truth is that she had a long history of the various authorizations and approvals which allowed her to do everything the defense claimed she was not allowed to do.

4. **Plaintiff's informing Pat Crane and Ro Turner of her moving down the block on Union Street in San Francisco in 2011**: An occasion in which the issue of approval and/or authorization was not raised by Defendants (or anyone else), indicating continuing authorization, and no problem with it.

5. **The terms of the business relationship between (a) One**

8

Plaintiff's Brief on Discovery Issues

**Kings Lane and (b) Defendants, and each of them, at any and all times from 1/1/10 to the present:** A central issue in the case: Why did Defendants give such advantages to OKL to the detriment of their productive dealer, and other such dealers? What happened in the relationship as OKL's fortunes fell so precipitously? How did that relationship relate to Defendants' conduct toward Plaintiff.

9. **Communications regarding discontinuing sales to Plaintiff's account - other than properly privileged attorney-client communications:** The main issue in this case is Defendants' destruction of Plaintiff's business by discontinuing sales to her account, which, after trying in fits and starts over the years, Defendants finally accomplished by breaching their agreement not to do that if Plaintiff complied with all their instructions about her store and website (which she did).

10. **The March 26-28, 2013 email communications involving Ro Turnber, William Morrison, Pat Crane, Tracie Burns, Karen Sloan, Ellen Brooks and Nicholas Manville:** These communications discussed, in not very specific terms, what the participants considered problems with Plaintiff, the likelihood of closing her down, certain failings on their part of which Plaintiff was rightfully complaining, and strategy on how to handle the development of this while pretending to be friendly to her. Shortly thereafter, Lauren's legal department sent Plaintiff a letter full of false accusations which Plaintiff refuted, then, later that year, William Li threatened Plaintiff over the phone, and in fact terminated Plaintiff, only to have that reversed a few days later by a superior, Ian Sears, who made the deal with Plaintiff to comply with all Defendants' instructions about her store and website, in order to avoid continue the parties' successful business relationship, which deal, upon Plaintiff's wildly successful performance of its terms, was immediately breached by Defendants' (*after Mr. Sears had left the company*) refusing to let Plaintiff use the Lauren name on her website, thereby crippling her business, while stonewalling her desperate requests for the permission, and, in a few months, having Mr. Manville terminate her, thus completely destroying her business.

16. **Lauren's Legal Department's 4/19/13 letter to Plaintiff**: See the place of this letter in the Category 10 narrative, above.

17. **Any and all communications about:**

   **a. Lauren's Legal Department's 4/19/13 letter to Plaintiff,**

   **b. The events leading up to that letter being generated, and**

   **c. The communications (written and/or oral) with Plaintiff and/or Michael Mott relating to that letter (including but not limited to the 5/16/13 email from Michael Mott to Anna Dalla Val, following up on their phone conference that day) - other than properly privileged attorney-client communications;** As shown in the above discussion of Category 10, this letter (*and Plaintiff's immediate refutation of it, indicating Ms. Dalla Val, who wrote it, had no understanding of its contents*) is significant in understanding the train of events that resulted in both (a) the contract and (b) its breaches that damaged Plaintiff.

18. **The accusations of wrongdoing by Plaintiff alleged in that letter:** Important to know where they came from, since the author of the letter had no understanding of them, and was unaware, until told by Plaintiff, of their falsity.

19. **Plaintiff's sale improvement rate in 2013:** Plaintiff's sale improvement rate is a phrase used by Mr. Morrison in connection with the rhetorical question he raised as to why Plaintiff, whose sales improvement rate was the highest in the company, was in process of being destroyed.

33. **The 11/18/13 letter from Ian Sears to William G. Morrison, Jr., including but not limited to:**

   **a. Everything leading up to its being generated; and**

   **b. Everything that flowed from it**: This letter, a few days after Mr. Li's shocking phone call, from the then-President of RLH to an officer of Victor, cited the 2009 License Agreement between the Defendants to the effect that, when an "Approved Account" failed to uphold and maintain the quality and prestige of the Licenced Products and/or Trademark, the Licensor shall have the right to revoke the approval; and so Plaintiff is no longer approved. Days later, Mr. Sears reinstated Plaintiff's account, leading to the train of events cited above. Since, far from the accusation, Plaintiff was (a) successfully spreading the gospel of

Defendant's brand all over the world, and (b) in the service of that, aggressively pressing Victor on Victor's failures in this regard that Plaintiff refused to pass on to her customers, therefore delving into what is clearly a false accusation is central to the case.

34. **Carley Conelli's 11/19/13 email to Jessica Linville, Massimo Scarfone and Plaintiff**: This letter tells Plaintiff that she's being cut off, and she should address any questions to Mr. Li; and it comes in the middle of the time period when the dispute between the parties resulted in Plaintiff's termination, which quickly turned in the express agreement at the center of the case.

41. **Authorization of online sale of Ralph Lauren Home products, including but not limited to:**

**(1)   Any and all rules pertaining to the authorizing of online sale of Ralph Lauren Home products, and**

**(2)   Any and all instances in which the Ralph Lauren Corporation (and/or any and all related entities) asserted that any person and/or entity, other than Plaintiff, sold Ralph Lauren Home products on its website without being authorized to do so by the company**: Defendants' refusal to authorize Plaintiff's use of "Ralph Lauren" in her online advertising (*which Plaintiff contends was based on no legally justifiable reason*) is a central issue in the case because it severely crippled her ability to do business online.

So, as is clear from the above, Defendants' assertions re these categories not being relevant are so insanely bogus that it would seem more likely that Defendants chose them by throwing darts against a board with random numbers, blindfolded.

D.   The true relevant law as to the first issue (extension of discovery) is, as the Supreme Court put it, in *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship* (1993) 507 US 380, 388: "an equitable exercise that takes into account the totality of the circumstances", including, as the Court of Appeals in the case from which the Supreme Court granted *certiorari* stated them [see 943 F2d, 673, 677]: the danger of prejudice [4], the length of the delay and its

---

[4]   Keeping in mind that there is no prejudice when whatever displacement is involved is easily adjusted to: *Westefer v. Snyder* (7th Cir. 2005) 422 F3d 570, fn21

potential impact on judicial proceedings, the reason for the delay, and whether the movant acted in good faith, along with the general elements of excusable neglect, inadvertence, and mistake.

All of these criteria point to granting the relief sought: (a) the confused profusion of continuances, partial continuances, and other procedural adjustments, (b) the extremely minor to non-existent effect on the case and the court's calendar of the few days difference, and (c) Plaintiff's counsel's good faith, as shown by the mountain of work he has already done to honor this case, making Plaintiff's counsel's very human inadvertence and mistake, highly excusable.

## CONCLUSION

Defendants continually try to make much of the false accusation that Plaintiff's counsel has been lazy, disrespectful, dilatory, etc., causing great delays to their clients whose only sin was to destroy Plaintiff's business (*that was very successful for all parties*), leaving Plaintiff without her life's work, at an advanced age.

These artificially pumped-up accusations (*which take on the aspects of a cottage industry for the herein Defendants to play up at every occasion*) are not only not true, but, as far as the delays in this case are concerned, these are, to a large extent, due to Defendants' typical tactics, in, for example, repeatedly making the most technical arguments in pleading motions, in direct contravention of the federal pleading laws which seek, more than anything else, to avoid arguments over technicalities, along with pushing unmeritorious sanctions motions that undeservedly furthered their above-stated main theme, thus delaying the case (*along with a mediation that went nowhere*), for almost two years, during which time discovery could not start without the settled pleadings, such that, thereafter, following Defendants' 4-5 month delay in complying with Plaintiff's document production request, and producing their proliferation of documents in jumbled order which substantially delayed Plaintiff's ability to proceed with the discovery that was planned to be based on those documents (*then being further squeezed by needing to produce a good faith effort into a Mandatory Settlement Conference which, confluent with the parties' predictions, turned out to have had little to no possibility of success from the outset*), Plaintiff had what amounted, from a practical point-of-view, to only a few months to conduct all the discovery that needs to be done in a case in which the facts span some 5 years of

flowing developments in the commercial relationships between the parties which involved numerous people, and enough ups and downs to make a clear narrative a difficult achievement, thus giving the defense another artificially short deadline against which to make their technical arguments seeking undue procedural advantage, the latest wrinkle of which has been the claim that complex issues with easy answers that are wrong because they ignore the complexities really should be handled in truncated pleadings, patently not fair to the party whose position depends, by law, on consideration of "the totality of the circumstances". [5]

      Plaintiff respectfully requests the following: In this case, with its very serious effects on Plaintiff's life, and with involved factual and legal issues that require the most careful consideration, it is respectfully requested that the court consider the issues at bar in this motion as the attempt that they are by Defendants to destroy this case the easy way, trying to get the court to truncate such consideration on the basis of well-practiced oversimplified procedural arguments directed more toward the difficult effects of the pandemic on the court's calendar than on the serious issues that are the substance of this case, and Plaintiff requests that the court, instead, make the truly practical small requested adjustments that will allow this case to proceed to deservedly, fully explore the serious issues involved in order to achieve the justice that is the hope of every and any body who cares about the law.

DATED: March 23, 2021                        Respectfully Submitted,

                                                      /s/
                                   MICHAEL COHEN, Attorney for Plaintiff

---

[5]    "Nothing to see here; just move along."